# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN CASTAGLIUOLO ET AL., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:09-cv-418 (VLB) |
| JOHN DANAHER, III, ET AL., | : | |
| Defendants. | : | March 29, 2011 |

### *MEMORANDUM OF DECISION GRANTING DEFENDANTS'*
### *MOTION FOR SUMMARY JUDGMENT [Doc. #44]*

The plaintiffs, Stephen Castagliuolo, Marianne Daly, Edward Gould, Dale Hourigan, James Salzano, Jr., Peter Wack and Bruce Whitaker (collectively, the "Plaintiffs"), each of whom are current or former lieutenants in the Connecticut State Police, filed this action for compensatory damages as well as declaratory and injunctive relief. They name as defendants John Danaher III, Thomas Davoren, Peter Terenzi II and Brenda Sisco (collectively, the "Defendants"), in both their official and individual capacities. The Plaintiffs assert a single cause of action against the Defendants pursuant to 42 U.S.C. § 1983 for violation of their right to freedom of association guaranteed by the First and Fourteenth Amendments to the United States Constitution. The complaint alleges that the Defendants retaliated against the Plaintiffs by refusing to promote them to the position of captain on account of their union organizing activities.

Presently pending before the Court is the Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Doc. #44]. The Defendants argue that the Plaintiffs' constitutional claim fails as a matter of law because their union association was not a matter of public concern, there is no

evidence that the Defendants were personally involved in the alleged constitutional violation, and there is insufficient evidence of a causal connection between the Plaintiffs' union activity and their non-promotion. The Defendants also argue that they are entitled to qualified immunity with respect to the Plaintiffs' claim for damages against them in their individual capacities. For the reasons stated below, the Defendants' motion is GRANTED.

## I. FACTS

The following facts relevant to the Defendants' motion for summary judgment, which are taken from the parties' Local Rule 56 Statements and supporting affidavits and exhibits, are undisputed unless otherwise noted.

### A. Parties

The Plaintiffs are current or former lieutenants in the Connecticut State Police, which is a division of the Connecticut Department of Public Safety ("DPS"). Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 1. Defendant John Danaher III ("Danaher") is the former Commissioner of DPS, having served in that position from March 5, 2007 to May 9, 2010. *Id.* ¶ 2. Defendant Brenda Sisco ("Sisco") is the former Commissioner of the Connecticut Department of Administrative Services ("DAS"), having served in that position from February 2008 to May 2010. *Id.* ¶ 3. Defendant Thomas Davoren ("Davoren") is a sworn officer in the Connecticut State Police, having been appointed to the rank of Colonel in February 2007. *Id.* ¶ 4. Defendant Peter Terenzi III ("Terenzi") is a former Lt. Colonel in the Connecticut State Police. *Id.* ¶ 5. As Lt. Colonel, Terenzi was in charge of field operations for approximately two years. His duties included day-to-day operations of State Police troops and

uniformed patrol officers, Bureau of Criminal Investigations units, and emergency service units. *Id.* ¶ 6.

### B. Plaintiffs' Union Activities

The Plaintiffs, who are members in good standing of the Connecticut State Police, have been at the forefront of efforts to form a union to represent members of the Division of State Police holding the ranks of lieutenant and captain. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 7. These efforts began in 2003-2004, when several officers met with then DPS Commissioner Arthur Spada to discuss the issue of pay disparities in the lieutenant and captain ranks. The issue was that lower ranking hourly personnel received higher pay than lieutenants and captains. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶7. Spada was succeeded as Commissioner of DPS by Leonard Boyle. *Id.* ¶ 8. Around May of 2005, the officers met with Commissioner Boyle and Lt. Colonel Edward Lynch to discuss the pay issue. *Id.* Sometime between May of 2005 and December of 2005, Commissioner Boyle and Lt. Colonel Lynch met with the Plaintiffs and reported back that they had spoken to OPM and the Governor's office, but their efforts to change the pay structure were unsuccessful. *Id.* During the meeting, Lynch informed Plaintiff Gould and other officers in attendance that they had to "do what they had to do" and did not discourage them from forming a union. *Id.* ¶ 9. The Plaintiffs claim, however, that during a private meeting at a later time, Lynch attempted to convince Gould that unionization of the lieutenant and captain positions would be a mistake, and attempted to dissuade him from continuing his unionization efforts. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 9. Gould and the other Plaintiffs nevertheless continued their efforts to unionize. In

May 2005 and again in December 2005, Gould authored and sent letters to lieutenants and captains in the State Police urging them to form a union to represent their interests, and inviting them to meetings to further this purpose. Compl. ¶¶ 40-45.

Thereafter, in 2006, forty-two lieutenants and captains met with the Connecticut State Employee Association ("CSEA") to discuss forming a union to represent the lieutenants and captains in addressing pay issues, assignments, and promotions. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 10. None of the Defendants were present at that meeting. *Id.* ¶ 11. On June 13, 2006, an agent for the State of Connecticut Board of Labor Relations ("Labor Board") ordered that an election be held to determine whether the CSEA should be designated the exclusive bargaining representative for a bargaining unit comprised of members of the State Police who held the rank of lieutenant or captain. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 10. In July 2006, over the objection of DPS, a union election was held, and the lieutenants and captains voted to have the CSEA, S.E.I.U. Local 201 represent them as a bargaining unit. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 12. Defendant Terenzi expressed his support for the unionization of lieutenants and captains mainly for financial reasons because he felt they were grossly underpaid, although he noted that not all of the issues raised during the meeting were of concern to him. Def. Exh. 5, Terzini Tr. [Doc. #44-4] at 18-19.

After the election results were tabulated, the Labor Board designated the CSEA as the exclusive bargaining representative for State Police lieutenants and captains. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 12. DPS appealed to the Labor Board from the order requiring an election. *Id.* ¶ 13. On February 17, 2007, the Labor

Board ruled against DPS on its appeal and affirmed certification of the CSEA as the exclusive bargaining unit for State Police lieutenants and captains. *Id.* ¶ 14. DPS, acting through the State Office of Labor Relations ("OLS"), filed an administrative appeal from the Labor Board's decision to the Connecticut Superior Court. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 15. On May 22, 2008, the Superior Court affirmed the Labor Board's ruling, and dismissed the appeal. *Id.*; *Conn. Dep't of Pub. Safety v. State of Conn., Bd. of Labor Relations*, No. CV074015397S, 2008 WL 2375390 (Conn. Super. Ct. May 22, 2008). DPS appealed the Superior Court's ruling to the Connecticut Supreme Court. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 16. On June 8, 2010, the Connecticut Supreme Court reversed the Superior Court's ruling and remanded the case back to the State Labor Board, finding that the Labor Board and the Superior Court had employed the wrong standard in determining whether lieutenants and captains were "managerial employees."[1] *Id.* ¶ 16; *Dep't of Public Safety v. State Bd. of Labor Relations*, 296 Conn. 594 (2010).

From 2007 into mid-summer 2009, the Plaintiffs openly met and communicated with numerous elected officials to advocate for the unionization of State Police

---

[1] **Under Connecticut law, managerial employees are prohibited from bargaining collectively with the State. Conn. Gen. Stat. § 5-270(b); *see also State Mgmt. Ass'n of Connecticut v. O'Neill*, 204 Conn. 746, 749 (1987). A "managerial employee" is defined as "any individual in a position in which the principal functions are characterized by not fewer than two of the following . . . (1) Responsibility for direction of a subunit or facility of a major division of an agency or assignment to an agency head's staff; (2) development, implementation and evaluation of goals and objectives consistent with agency mission and policy; (3) participation in the formulation of agency policy; or (4) a major role in the administration of collective bargaining agreements or major personnel decisions, or both, including staffing, hiring, firing, evaluation, promotion and training of employees." Conn. Gen. Stat. § 5-270(g).**

5

lieutenants and captains.  Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 8.  In September

2008, the Plaintiffs joined several members of the Connecticut State Legislature at

the State Capital for a televised press conference during which these legislators

were publicly advocating on behalf of unionization for the lieutenants and captains.

*Id.*

### C.  Background Information on DPS Captain Examination and Promotions

DPS is divided into three divisions:  the Division of Scientific Services, the

Division of State Police, and the Division of Fire, Emergency and Building Services.

Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 30.  Within the Division of State Police,

there are three major areas, the Office of Professional Standards, the Office of Field

Operations and the Office of Administrative Services.  *Id.* ¶ 31.  Most of the sworn

officers serve in Field Operations, which includes all the troops throughout the state.

*Id.*

DAS, pursuant to its statutory responsibilities, administers aspects of state

regulations and statutes relating to state job classifications, examinations for certain

classified positions and aspects of the State Personnel Act.  *Id.* ¶ 32.  DAS has a

specific division, Statewide Human Resources Management, headed by Dr. Pamela

Libby, that designs and administers examinations for classified state positions, such

as sergeant, lieutenant and captain in the Connecticut State Police.  *Id.* ¶ 33.  In order

to be eligible for promotion to the rank of State Police sergeant, lieutenant or captain,

an employee must be on a current DAS examination list.  *Id.* ¶ 34.  The rank of major

is an appointed position and does not require an examination.  *Id.*  Any officer at the

rank of lieutenant or captain can be appointed to the rank of major.  *Id.*

Pursuant to Connecticut General Statutes § 5-217, an examination list is active for one year, with the option to be renewed for up to two additional years. *Id.* ¶ 35. After three years, the list expires and a new test must be administered if promotions are to be made. *Id.* There is no requirement that a list be extended for the full three years. *Id.*

DAS must review and approve all DPS requests to hire or promote an employee in order to ensure compliance with Connecticut statutes. *Id.* ¶ 36. The Office of Policy and Management ("OPM") must approve the funding for all agency hires and promotions. *Id.* DAS has no authority over what specific employee fills a certain position or assignment within DPS except that the person chosen must meet all merit system requirements. *Id.* ¶ 37. Once DPS obtains approval from OPM for one or more promotions in any rank, then DAS will review the actual promotions at three levels. *Id.* First the DAS liaison will review the promotion to make sure it is necessary and appropriate. *Id.* Second, DAS will ensurethat DPS followed applicable rules regarding re-employment. *Id.* Third, the DAS Central Audit team will review the promotion to verify that the individual was on a current examination list and that the salary was calculated properly. *Id.*

DPS utilizes a Personnel Systems Report ("PSR") which identifies each job classification and the maximum number of employees who can fill each job classification at any given time. *Id.* ¶ 38. The PSR is established and controlled by OPM and DAS. *Id.* Any changes to the allocation must be approved by OPM and DAS. *Id.* For instance, among the ranks of sworn officers in January 2006, the PSR authorized DPS to employ two lieutenant colonels, seven majors, fifteen captains,

twenty-nine lieutenants, fourteen master sergeants, 173 sergeants, 631 troopers-first class, 302 troopers, and three trooper trainees. *Id.* ¶ 39. DPS does not employ sworn officers for a particular assignment. *Id.* Instead, assignments are determined based upon the needs of the agency by utilizing the total allocation of positions authorized by the PSR. *Id.* Sworn officers of various ranks are routinely moved around to different assignments within the DPS divisions to meet the needs of the agency at any given time. *Id.* ¶ 40. If a sworn officer leaves employment with DPS, the actual count of active employees would show a vacancy for a slot in his particular rank. *Id.* ¶ 41. That person's assigned duties would be reassigned to another active officer in the same or a different rank, gain depending on the needs of the agency until it is refilled, if approved. *Id.*

Between 2006 and 2009, the Colonel's Chief of Staff, Major William Podgorski, periodically prepared a report to the Commissioner of DAS about vacancies within the various officer ranks based upon the PSR, along with an analysis of proposed promotions and their budgetary impact. *Id.* ¶ 42. Again, all promotions within the ranks of the State Police must be approved by OPM and then DAS. *Id.* ¶ 43. If authorized to make promotions in a certain rank, there is a cascade effect through the lower ranks after a promotion is made. *Id.* For instance, if five lieutenant slots are filled with master sergeants or sergeants, there would then be five promotions to sergeant. *Id.* The overall PSR allocation would not change. *Id.*

### D. Alleged Retaliation Against Plaintiffs

The Plaintiffs have the necessary qualifications and have satisfied the requirements for promotion to the rank of captain. Pl. 56(a)(2) Statement [Doc. #50],

Part B ¶¶ 2-4.  On January 31, 2006, DAS formally announced examination No. 060380 for the rank of captain within DPS, with a closing date of February 18, 2006.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 44.  The captain examination had three components:  written, oral and "experience & training."  *Id.*  The Plaintiffs passed the promotional examination, and they were placed on the eligibility list assembled by the State for promotion to captain which expired on May 28, 2009.  Pl. 56(a)(2) Statement [Doc. #50], Part B ¶¶ 5-6.  The record does not reflect what specific scores the Plaintiffs received.

On May 29, 2006, DAS released the results for the captain examination No. 060380.  There were fourteen State Police lieutenants, including the Plaintiffs, who passed the examination with scores ranging from a high of 93 to a low of 77.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 45.  One candidate, Lieutenant O'Hara, challenged the scoring of his examination and DAS ultimately adjusted his score from 86 to 87.  *Id.* ¶ 46.  A revised list of captain candidates was then released.  *Id.*  In 2006, Leonard Boyle was the Commissioner of DAS.  *Id.* ¶ 47.  When using the DAS list for promotion to captain, Commissioner Boyle and then Commissioner Danaher would typically use the examination score, except when there were several candidates with the same examination score, in which case the officer with the most seniority in that particular score percentile would be promoted first.  *Id.* ¶ 48.

In May 2006, DPS Major Podgorski submitted a report of vacancies for captain, lieutenant, master sergeant and sergeant within DPS.  *Id.* ¶ 49.  That report listed a need for three captains, eight lieutenants, one master sergeant and seventeen sergeants to fill allocated slot vacancies in the PSR.  *Id.*  Of those, Major Podgorski

identified the following as "critical" vacancies that had to be filled to ensure continuity of operations: two captains, six lieutenants, one master sergeant and ten sergeants. *Id.*; Podgorski Aff., Def. Exh. 14 [Doc. #44-6] ¶ 16. OPM approved the promotion of two lieutenants to the rank of captain. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 50. On July 21, 2006, DPS lieutenants Robert Corona and Gene LaBonte were promoted to captain off the May 2006 DAS captain examination list by DPS Commissioner Boyle. Corona was ranked first on the captain list with a score of 93 and LaBonte was ranked second with a score of 92. *Id.* ¶ 51.

In September 2006, Major Podgorski again prepared a report of vacancies for captain, lieutenant, master sergeant and sergeant within DPS. *Id.* ¶ 52. That report listed a need for one captain, three lieutenants, two master sergeants and thirteen sergeant to fill vacancies in the PSR. *Id.* OPM approved the promotion of one lieutenant to the rank of captain in late 2006. *Id.* ¶ 53. Four lieutenants were tied with a score of 87, so on October 30, 2006, DPS Lieutenant Carl Schultz was promoted to captain from the captain list by DPS Commissioner Boyle because he had the most seniority within that score percentile. *Id.* ¶ 54.

In December 2006, a report was issued by the New York State Police (the "New York Report") evaluating the Professional Standards Division. *Id.* ¶ 55. That report recommended that all investigators within the Professional Standards Division remove sergeants as investigators and replace them with lieutenants. *Id.* Historically, from 2000 to 2006, DPS operated with approximately twenty-eight to thirty-one lieutenants and twelve to nineteen captains. *Id.* In late 2006, in order to implement the changes recommended in the New York Report, DPS asked OPM and

DAS to alter its PSR allocation to increase the number of lieutenants and decrease slightly the number of captains to cover the increased costs. *Id.* ¶ 56. That request was approved and the number of lieutenants in the PSR was increased to approximately thirty-eight to forty-one. *Id.* Most of the new lieutenants were assigned to the Professional Standards Division. *Id.*

In 2007, the DAS Captains List was extended by DAS at the request of DPS Commissioner Danaher. *Id.* ¶ 57. The list was extended a total of four times as follows: from May 30, 2007 to December 20, 2007; from December 20, 2007 to April 30, 2008; from April 30, 2008 to October 29, 2008; and finally from October 29, 2008 to May 28, 2009. *Id.* ¶ 57. Nevertheless, the Plaintiffs claim that, throughout their unionization efforts, representatives of the State Police communicated their intention to allow the captain promotion eligibility list to expire without appointing any additional captains regardless of the existence of vacancies in the captain rank. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 20. On December 18, 2007, the Plaintiffs met with Defendants Danaher and Davoren and the State Police human resources director, Ron Savitski, and questioned them as to why they would "kill" the captain eligibility list. *Id.* ¶ 21. According to the Plaintiffs, the Defendants confirmed that they planned on "killing" the captain eligibility list even though it had another year of validity. *Id.* ¶ 22. Specifically, Terenzi communicated to Castagliuolo that Danaher and Davoren intended to have the eligibility list expire. *Id.* ¶ 23. The Plaintiffs contend that, since they were on the eligibility list, this evidences the Defendants' retaliatory animus against them, notwithstanding the undisputed fact that Danaher

did not allow the list to expire, but instead requested and obtained acquiescence from DAS to extend the list until May 28, 2009, the maximum time allowed by law.

In addition, the Plaintiffs contend that, after the Labor Board designated the CSEA as the exclusive bargaining representative for State Police captains and lieutenants, the Defendants drastically reduced the number of captains, placing lieutenants in positions which had traditionally been occupied by captains. *Id.* ¶ 24. Plaintiff Hourigan testified that, during the period of 2006 to 2009, the rank of captain declined by 32%, while the remaining ranks within the Division of State Police experienced significant increases. *Id.* ¶ 25. The Plaintiffs do not explain how Hourigan arrived at the 32% figure. According to the Plaintiffs, the Defendants refused to request authorization for captain promotions from OPM and/or DAS in order to deny the Plaintiffs a promotion. *Id.* ¶ 43. They base this on a statement by Linda Yelmini, the Director of OLS, that "They got to a point where they thought that the remaining individuals were not good candidates based on their qualifications for the role of captain, so they stopped." *Id.*

The Plaintiffs also claim that, although there were vacant positions during the times relevant to this case which had historically been held by captains who had successfully passed a certified civil service examination, the Defendants circumvented the requirements of the State merit system by assigning lieutenants and sergeants to fill these positions. Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 29. Specifically, they filled the positions of Deputy Commander of the Bureau of Criminal Investigations, Legislative Liaison, Forensic Laboratory Commander, and Troop W Commander, which had been filled by captains, with lieutenants and sergeants. *Id.*

The Plaintiffs contend that the Defendants' substitution of lieutenants and sergeants for captains was a violation of merit system principles, under which "An employee can only be called a State Police Captain and/or given the duties of a State Police Captain if s/he is appointed to a State Police Captain position in accordance with merit system requirements (i.e. take and pass an examination)." *Id.* (quoting Email from Brenda Sisco dated March 6, 2006, Def. Exh. 16 [Doc. #44-6]).

In March 2008, Major Podgorski again prepared a report of vacancies for captain, lieutenant, master sergeant and sergeant to fill vacancies in the PSR. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 58. That report requested from OPM and DAS that slots be filled for two captains, eleven lieutenants, six master sergeants and twenty-three sergeants. *Id.* OPM and DAS approved the promotion of two lieutenants to the rank of captain. *Id.* ¶ 59. At the time, three captain candidates remained on the May 2006 DAS captain list with a score of 87. *Id.* On March 28, 2008, based upon seniority, Lieutenants Meraviglia and O'Hara were promoted to captain by Commissioner Danaher. *Id.* ¶ 60. Both had a score of 87. *Id.*

In May 2008, due to projected budgetary deficits, OPM instituted a hiring freeze. *Id.* ¶ 61. The Plaintiffs admit that there was a hiring freeze in effect, but claim that during the freeze DPS nevertheless made numerous sworn and civilian promotions, including a promotion of Podgorski from lieutenant to major in August 2008. Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 61. In June 2008, then Governor Rell proposed a five percent rescission to the 2009 budget. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 62. For DPS she proposed over $1 million in cuts to personal services (salaries). *Id.* The Governor's rescission plan was increased in October 2008 to

further reduce the DPS budget.  *Id.*  In February 2009, OPM announced the cancellation of all classified vacancies due to retirements, which were not scheduled to be refilled.  *Id.* ¶ 63.

Meanwhile, while DPS's appeal from the Connecticut Superior Court's May 22, 2008 decision affirming the Labor Board's certification of the CSEA as the exclusive bargaining unit for State Police lieutenants and captains was pending, Yelmini had what the Defendants characterize as "off the record" discussions with CSEA Attorney Robert Krzys about potentially settling the issue regarding unionization of lieutenants and captains and thereby resolving the appeal.  *Id.* ¶ 17.  The Defendants assert that some of the proposals discussed included breaking out the lieutenants and excluding captains from the union; excluding certain job assignments such as barracks commanders from the union; and providing a pay raise to all lieutenants and captains.  *Id.* ¶ 18.  However, the Plaintiffs contend that the only proposal made by the State was to break out the lieutenants and exclude captains from the union, while promoting barracks commanders to the rank of captain.  Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 18-19.  Under this proposal, a significant number of lieutenants would be promoted to captain, and those individuals that were promoted would take over the responsibilities of barracks commander for the State Police's twelve troops.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 21.  As barracks commanders, the promoted captains would be managerial employees exempt from collective bargaining.  Krzys Tr. [Doc. #49-14], at 15.  The remaining lieutenants would then form a small union.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 21.  The proposal to increase the rank of the barracks commander position from lieutenant to captain

**14**

would have increased the number of captain positions from 13 to 25.  Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 37.  Davoren explained that the reason he objected to the inclusion of barracks commanders in the union was that, from an operational standpoint, he needed managers as barracks commanders.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 20.  Therefore, he supported the proposal to promote captains to barracks commander and exclude them from the union, while unionizing the lieutenant rank.  *Id.*  Davoren's view was shared by OPM Secretary Robert Genuario, who was quoted as saying that "besides financial considerations for the state, the agency does not want police supervisors' loyalties split between the interest of the state police and the interest of the bargaining unit."  *Id.* ¶ 25.

Danaher testified that he spoke with the Governor's office about the idea of removing captains from the union and promoting the barracks commanders to the rank of captain, thereby leaving a small union made up of lieutenants.  *Id.* ¶ 22.  According to the Defendants, the Governor rejected the proposal on the basis that it did not appear to be a sensible way to run the department.[2]  *Id.*  Both Yelimini and

---

[2]  **The Plaintiffs object this fact on the basis that Danaher's testimony regarding his discussions with the Governor's office constitutes inadmissible hearsay that may not be considered by the Court in ruling on the Defendants' motion for summary judgment.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").  However, the Defendants are not offering the Governor's explanation to prove the truth of the statement that the proposal was not a sensible way to run the department.  Instead, the Defendants submit that they are offering this statement to demonstrate the Governor's act of rejecting the idea of restructuring DPS, which they claim shows that none of the defendants were the decisionmaker with respect to the proposal which the Plaintiffs contend would have increased the number of police captains.  Def. Reply at 3.  Therefore, since the statement is not being used to prove the truth of the matter asserted, it does not qualify as hearsay.  *See Howley v. Town of***

Attorney Krzys testified that they recall there being no formal offer of settlement between the parties. *Id.* ¶ 23. The Defendants claim that only the Governor could approve a settlement of the legal challenge at issue because it would involve changes to the structure of DPS. *Id.* ¶ 24. They contend that Danaher, Davoren, Terzini and Sisco had no authority to settle any lawsuit. *Id.* They also assert that Yelimini could only settle the matter with the Governor's express authorization, which never occurred. *Id.*

The Plaintiffs dispute the Defendants' contentions that no formal offer of settlement was made by the State, and that Yelmini had no authority to settle the lawsuit. According to the Plaintiffs, Yelimini made a settlement proposal to the CSEA on behalf of the State, and she had the requisite authorization to extend the offer in question. They base this assertion on the following evidence. Davoren testified that the State made a settlement proposal to the CSEA to increase the rank of barracks commanders from lieutenant to captain in return for the CSEA agreeing to give up its efforts to unionize the captain position. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 31. The Plaintiffs cite to correspondence between Yelimini and Terenzi, Davoren and Danaher to support their contention that the State had made a proposal to the CSEA to settle the unionization issue. *Id.* ¶ 32. This correspondence includes an email dated August 4, 2008 from Yelimini to Terenzi which referenced the

---

*Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (testimony that person made statements is not hearsay if it "would be offered not to prove the truth of his statements but only to prove that he made them"); *see also* Fed. R. Evid. 801(c) Advisory Committee Notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

captain and lieutenant positions and instructed Terenzi to "call me, important." Pl. Exh. 1 [Doc. #49-2]. Later the same day, Yelmini sent Terezeni another email with the reference, "Tomorrow Captains & Lts.", and stated "We're on for 2:00 tomorrow to meet with Commissioner & Col. Davoren." Pl. Exh. 2 [Doc. #49-3]. Danaher recalled that the meeting referred to by Yelmini in her email involved in an oral discussion of a settlement proposal which would result "in a significant number of lieutenants being promoted to the rank of captain . . . they would take over the responsibility of commanding officers of the troop; that is, the individual twelve troopers, and that the remaining lieutenants would form a union." Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 36. Terenzi and Davoren both had the same recollection. *Id.* Finally, Yelmini asserted in her first deposition that "The Office of Labor Relations is in power [sic] to make settlements. It's the Governor's representative." *Id.* ¶ 29.

The Plaintiffs claim that Yelmini made the proposal to the CSEA to elevate barracks commanders to captain after obtaining the consent of Danaher, Davoren and Terenzi. *Id.* ¶ 28. For their part, the Defendants admit that Yelmini discussed various proposals with Danaher, Davoren, and Terenzi in order to assess the feasibility and financial impact of any proposal on DPS. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 19. The Plaintiffs further contend that, when the State made the proposal to increase the rank of the barracks commander position from lieutenant to captain, Yelmini had discussions with Danaher, Davoren and Terenzi about the captain eligibility list. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 38. In an email dated August 7, 2008, Yelmini sent an email to Terenzi containing the subject line "Captain's Exam list" and stated "Could you please call me about the above when

you get a chance.  Thanks."  Pl. Exh. 3 [Doc. #49-4].  On September 29, 2008, Yelmini

wrote to Davoren and Danaher and asked them to call her regarding a "possible

settlement."  Pl. Exh. 4 [Doc. #49-5].

Danaher testified there was some discussion to the effect that had a

settlement been approved that called for the promotion of twelve to fifteen new

captain slots, that perhaps the promotion process should be opened up to all eligible

employees.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 26.  The Defendants claim

that a new examination would include an opportunity for all of the Plaintiffs.  *Id.*  The

Plaintiffs contend, however, that requiring a new promotion eligibility list in fact

denied them a promotional opportunity.  Pl. 56(a)(2) Statement [Doc. #50], Part A ¶

26.  The Plaintiffs claim that they were the remaining candidates on a certified merit

promotion list, and that they would have been guaranteed appointments if the

settlement had been reached and the list was employed to make promotions to the

newly designated captain positions.  *Id.*  They submit that they lost this opportunity

because Danaher insisted on assembling a new list.  *Id.*  They contrast Danaher's

view that a new test may be needed at this time with the approach he took when

making two promotions to the position of captain in 2008, at which time he displayed

no concern for "tak[ing] in as many eligible people as possible to take the test and

then promote from there."  *Id.* ¶ 29.  They claim the reason for this difference was

that the two individuals promoted in 2008 had not been involved in unionization

efforts.  Danaher explained, however, that assembling a new list made some sense if

the contemplated restructuring was to occur within DPS, because there would be

more openings than candidates on the existing list and to open the test to other

eligible employees would enable DPS to generate a list of qualified candidates sufficient to fill all of the potential captain positions.  Danaher Tr. [Doc. #49-10] at 25.

The Plaintiffs dispute the reasons given by the Defendants as to why the settlement was not finalized.  They claim that the State's proposal to increase the rank of barracks commander position from lieutenant to captain was not adopted because the State insisted on giving a new test from which to make all appointments to the increased number of captain positions, instead of first exhausting the current list on which the Plaintiffs were placed based on their scores on a merit examination. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 43.  They base this claim on a June 2, 2009 email from Yelmini to OPM Secretary Robert Genuario in which she stated that the individuals remaining on the list "were not people that [DPS] believed to be qualified for captain positions."  Pl. Exh. 17, Yelmini Tr. [Doc. #49-17] at 17, 42.  Similarly, Yelmini testified that she had informed Krys during settlement negotiations that "They got to a point where they thought that the remaining individuals were not good candidates based on their qualifications for the role of captains, so they stopped." Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 44.  Yelmini was unable to recall specifically how she formed that impression, but admitted that the information "probably" claim from Davoren, Danaher or Terenzi.  Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 27.  The Plaintiffs claim that this evidence supports an inference that the Defendants would only agree to the settlement proposal formulated by Yelmini if the current list on which the Plaintiffs were next in line to be promoted was not employed to make promotions of lieutenants to the barracks commander positions. *Id.* ¶ 28.  Thus, the Plaintiffs contend that the actual reason the settlement failed was

**19**

that the Defendants refused to agree to the proposal because it would have resulted in their promotion to the rank of captain. Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 48.

On March 3, 2009, Plaintiff Gould asked DPS Commissioner Danaher to consider promoting the remaining seven or so lieutenants on the 2006 DAS captain list without an increase in pay. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 66.[3] Danaher passed this request along to DAS. *Id.* ¶ 67. On March 6, 2009, DAS Commissioner Sisco reported back to Commissioner Danaher that it was not possible to do so within the state merit system. *Id.* She also noted that at that time, there were no current approved vacancies. *Id.*

In October 2009, Major Podgorski prepared a report of vacancies for captain, lieutenant, master sergeant and sergeant to fill vacancies in the PSR. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 64. That report requested that slots be filled for three majors, five captains, fourteen lieutenants, three master sergeants and thirty sergeants. *Id.* Of the requested slots the critical vacancies were for three majors, three master sergeants and twenty sergeants. *Id.* However, due to budgetary problems within the State, OPM did not approve the promotion of any captains or lieutenants in 2009. *Id.* ¶ 65. The Plaintiffs admit that OPM did not approve any promotions to captain or lieutenant in 2009, but note that from July to December 2009 there were three promotions to the rank of lieutenant colonel, two promotions

---

[3] The Plaintiffs admit that Gould made this request, but clarify that Gould's proposal was not to permanently forego a pay increase upon promotion to captain, but instead to temporarily suspend an incremental increase in pay. Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 66.

to the rank of master sergeant, and nineteen promotions to the rank of sergeant.  Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 65.

The Defendants contend that the Plaintiffs were never promoted from the 2006 captain list because the Governor, OPM and DAS did not approve any additional promotion requests from DPS as of that list's expiration in May 2009.  Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 68.  According to the Defendants, neither Davoren nor Terenzi said anything negative about promoting people off the 2006 list, if the opportunity had presented itself.  *Id.* ¶ 28.  Defendant Sisco had no communications or contact with any of the Plaintiffs in this lawsuit about the promotion of people from the 2006 captain list. *Id.* ¶ 69.  Danaher promoted officers to captain from the 2006 captain list in the order of their qualification by score and seniority whenever OPM approved such promotions.  *Id.* ¶ 29.

The Plaintiffs claim, however, that the Defendants' attempt to justify their refusal to promote the Plaintiffs on the basis of budgetary reasons is a pretext to cover up their retaliation against the Plaintiffs for participating in union organizing activities.  Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 50.  They contend that the State's bleak financial condition had nothing to do with the rejection of the proposal to increase the ranks of the barracks commander position.  Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 68.  Relying upon Davoren's testimony, they state that if a settlement agreement had been reached increasing the number of captains, approval from OPM and DAS would have followed.  Pl. 56(a)(2) Statement [Doc. #50], Part B ¶ 50.  According to the Plaintiffs, the proposal to elevate the rank of barracks commander from lieutenant to captain made economic sense because the captains

who would serve as barracks commanders would not be eligible for overtime as lieutenants would be. *Id.* ¶ 51.

The 2006 captain eligibility list expired on May 28, 2009. Thereafter, DAS promulgated a new DPS captain list for examination 090210. Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 70. Twenty-three lieutenants passed the examination with scores ranging from 93 to 74. *Id.* Plaintiffs Castagliuolo, Daly, Wack and Hourigan passed the examination and are on the current DAS list. *Id.* Plaintiffs Gould, Salzano and Whitaker either did not take or did not pass the examination and are not on the list.

## II. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v.*

22

*Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

## III. DISCUSSION

### A. Elements of First Amendment Retaliation Claim

It is well-established that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Nevertheless, in its role as an employer, the State possesses "greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions." *Lewis v. Cowen*, 165 F.3d 154, 161 (2d Cir. 1999). Therefore, the Court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). A plaintiff pursuing a claim for First Amendment retaliation must demonstrate that "(1) his speech [or conduct] addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech [or conduct] and the adverse employment action, so that it can be said that his speech [or conduct] was a motivating factor in the determination." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004). If the plaintiff satisfies these factors, the government may avoid liability by either "(1) demonstrat[ing] by a preponderance of the evidence that

it would have taken the same adverse action regardless of the protected speech [or conduct], or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment rights." *Id.* The Second Circuit has held that the "public concern" requirement applies to retaliation claims based on freedom of association as well as those based on freedom of speech. *Id.*

The parties do not dispute the second element of a First Amendment retaliation claim, whether the Plaintiffs suffered an adverse employment action. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (stating that denial of a promotion constitutes an adverse employment action). Therefore, the Court focuses its analysis on the first and third elements.

### 1. Public Concern

The protected conduct alleged by the Plaintiffs in this case are their efforts to form a union to represent members of the State Police holding the ranks of lieutenant and captain. The Defendants argue that the Plaintiffs' union activities did not address a "matter of public concern" because the impetus for forming a union was to attempt to reform the pay structure for lieutenants and captains, who had not received raises in pay over several years. The Defendants characterize the Plaintiffs' union activities as relating solely to personal concerns about their terms of employment, specifically their compensation.

Therefore, the Court must decide whether the Plaintiffs' union organizing activities touch on an issue of public concern. This determination must be made based upon "the content, form, and context of a given statement, as revealed by a

the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). In general, speech on "any matter of political, social, or other concern to the community" is protected. *Id.* at 146. However, as another Judge in this District has observed, the *Connick* standard, "which makes sense in the context of retaliation for speech, is difficult to apply in the context of an association claim." *Maglietti v. Nicholson*, 517 F. Supp. 2d 624, 634 (D. Conn. 2007). The question of whether certain speech or conduct is protected under the First Amendment is one of law, not fact. *Connick*, 461 U.S. at 148 n.7.

In *Clue v. Johnson*, the Second Circuit held that "retaliation solely for union activity clearly raises a public concern under *Connick*[.]" 179 F.3d 57, 61 (2d Cir. 1999). The plaintiffs in *Clue* were the leaders of a union minority faction who were engaged in a dispute with union leaders regarding the stance the union was taking toward their employer's labor policies. *Id.* at 60-61. The plaintiffs alleged that "union leaders were 'in bed' with management and supported management policies that redounded to the disadvantage of workers." *Id.* at 61. The specific activities that the *Clue* plaintiffs engaged in included handing out leaflets, distributing a union newsletter, and seeking signatures on a petition to recall certain union leaders who had signed a pension plan with management. *Id.* at 59. In rejecting the defendants' argument that the plaintiffs' activities were not entitled to First Amendment protection because they involved an internal union dispute, the Second Circuit reasoned that "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under *Connick*." *Id.* at 61.

Subsequently, in *Cobb*, the Second Circuit was confronted with the issue of whether union member alone satisfies the public concern requirement. *Cobb*, 363 F.3d at 107. However, the Second Circuit declined to decide the issue, and instead based its ruling on other grounds. *Id.* at 107. Several district courts in this Circuit have held that union membership in and of itself satisfies the public concern requirement. *See, e.g.*, *Donovan v. Incorporated Village of Malverne*, 547 F. Supp. 2d 210, 218 (E.D.N.Y. 2008); *Scott v. Goodman*, 961 F. Supp. 424, 435 (E.D.N.Y. 1997); *Maglietti v. Nicholson*, 517 F. Supp. 2d 624, 635 (D. Conn. 2007).

In this case, the Plaintiffs' union activities went beyond mere membership. The Plaintiffs were at the forefront of efforts to organize a union. These efforts included meeting with State officials and legislative leaders, attending public hearings, communicating with established unions, participating in settlement discussions with State officials, and sponsoring union organizational meetings. Under the reasoning of *Clue*, these activities suffice to meet the public concern requirement. 179 F.3d at 60 ("There is no doubt that retaliation against public employees solely for their union activities violates the First Amendment."). Although the Plaintiffs' dissatisfaction with their pay and rank as lieutenants may have been the impetus for forming a union, the Plaintiffs' constitutional claim is based on the alleged retaliation to which the Defendants subjected them because of their union organizing activities, not because of personal complaints about the terms of their employment. Therefore, the Court holds that the Plaintiffs have satisfied the "public concern" element of a retaliation claim.

## 2. Causal Connection Between Protected
## Conduct and Adverse Employment Action

The Plaintiffs can establish a causal connection between their protected expression and an adverse employment action indirectly "by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris*, 196 F.3d at 110. "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Id.*

The Defendants argue that the Plaintiffs cannot establish a causal connection because they have not produced sufficient evidence to show that any of the named Defendants were personally involved in a violation of their constitutional rights. In order to hold the Defendants personally liable for a constitutional violation pursuant to Section 1983, the Plaintiffs must show that each Defendant was personally involved in the alleged violation of their First Amendment associational rights. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) ("in this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983"). A government official cannot be held personally liable merely because he or she occupies a high position in an agency's hierarchy. *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995). In a retaliation case, personal involvement requires "direct participation," meaning "intentional participation in the conduct constituting a

violation of the victim's rights by one who knew of the facts rendering it illegal."
*Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (analyzing personal involvement of defendant in the context of the causation requirement of a retaliation claim). This is because a defendant's state of mind is necessarily at issue in retaliation cases, given that the plaintiff must prove that the protected conduct was a substantial motiving factor in the adverse employment action taken against him. *Id.*

The Defendants contend that they cannot be held liable because none of them actually possessed the authority to promote the Plaintiffs, and the failure of the Plaintiffs to be promoted to captain resulted from events beyond their control. In addressing this argument, the Court will consider the evidence of retaliatory conduct submitted by the Plaintiffs. That evidence falls into the following three categories. First, the Plaintiffs claim that the Defendants retaliated against them by rejecting a settlement offer that would have resulted in their promotion to captain. Second, the Plaintiffs claim that the Defendants significantly reduced the number of captains and placed lieutenants in positions that had traditionally been occupied by captains in order to avoid promoting them. Third, the Plaintiffs contend that the evidence shows that the Defendants did not believe the Plaintiffs to be qualified candidates to be promoted to captain.

### a. Settlement Negotiations

The Plaintiffs' primary argument relates to the settlement proposal discussed between the CSEA and Yelmini, the Director of OLS, who is not a defendant in this case. The evidence before the Court shows that, while DPS's appeal from the Connecticut Superior Court's May 22, 2008 decision affirming certification of the

28

CSEA as the exclusive bargaining representative for State Police lieutenants and captains was pending, Yelmini and CSEA Attorney Robert Krzys had discussions about a potential settlement that would have resolved the appeal. The primary idea discussed was to recognize captains as managers and promote a significant number of lieutenants to captain and have them take over the responsibilities of barracks commanders for the State Police's twelve troops. Traditionally, lieutenants had served as barracks commanders. This proposal would have resulted in the exclusion of captains from the union, thereby leaving a small number of lieutenants who were not promoted to form the union. The parties offer differing characterizations of the settlement discussions. The Defendants claim that the discussions were informal, "off the record" discussions that never resulted in a formal proposal, while the Plaintiffs claim that Yelmini made a formal settlement proposal that was later rejected by the Defendants. In any event, it is undisputed that the settlement that was discussed never actually materialized.

According to the Defendants, the reason the settlement failed was that the Governor's office rejected the proposal to restructure DPS in the manner contemplated by the settlement. The Defendants claim that they had no authority to settle a lawsuit, and that Yelmini could only settle the lawsuit with the Governor's express authorization, which was never provided.

The Plaintiffs contend, however, that the actual reason the settlement failed was because they were on the captain eligibility list and the settlement would have resulted in their promotion to captain. Although the Plaintiffs admit that the Defendants did not have the authority to settle the lawsuit, they claim that the

evidence shows that the Defendants were ultimately responsible for rejecting the settlement, and that they did so because of the presence of the Plaintiffs on the captain eligibility list. This claim is unfounded. The documentary and testimonial evidence offered by the Plaintiffs demonstrates nothing more than that Yelmini discussed the settlement proposal with Danaher, Davoren and Terenzi. There is no evidence that Sisco had any involvement at all in the settlement negotiations. The Defendants admit that Yelmini consulted with Danaher, Davoren and Terenzi to assess the feasibility and financial impact of any proposal on DPS. Danaher, in turn, spoke with the Governor's office about the idea, but the Governor rejected it. The Plaintiffs cite no evidence indicating that Danaher, Davoren or Terenzi expressed any retaliatory animus toward them during these discussions, nor is there any indication that any of the Defendants influenced Yelmini, the Governor, or anyone else with settlement authority to reject the proposal being discussed. To the contrary, Davoren supported the proposal to promote barracks commanders to the rank of captain with the understanding that they would not be unionized. No evidence has been proffered regarding Danaher or Terenzi's position on the proposed settlement.

The Plaintiffs also contend that, when the State made the proposal to increase the rank of the barracks commander position from lieutenant to captain, Yelmini had discussions with Danaher, Davoren and Terenzi about the captain eligibility list. Based upon this, they seek to draw the inference that the settlement proposal failed because they were on the list and DPS refused to promote them. They claim instead that DPS wanted to generate a new captain eligibility list based on a new DAS examination. This contention is entirely speculative, however, as there is no

evidence cited to support it.  Danaher testified that there were discussions to the effect that if a settlement were approved calling for the promotion of twelve lieutenants to captain, perhaps the promotion process should be opened up to all eligible employees.  He further explained that assembling a new list made some sense if the contemplated restructuring was to occur within DPS, because there would be more openings than candidates on the existing list and to open the test to other eligible employees would enable DPS to generate a list of qualified candidates sufficient to fill all of the potential captain positions.  Ultimately, however, the settlement was not approved, and therefore the issue regarding which list would be used was rendered moot.  Given the Plaintiffs' admission that the Defendants had no authority to approve the proposed settlement, and the absence of evidence showing that they caused those with settlement authority to reject the settlement because of the Plaintiffs' protected activity, the Plaintiffs cannot establish the requisite causal connection to support their retaliation claim based upon the failure of the settlement negotiations.

### b.  Reduction in Captain Positions

Next, the Plaintiffs claim that, from 2006 to 2009, captain positions within the Division of State Police decreased by 32%, while all other ranks experienced significant increases.  The Plaintiffs further claim that, during this same time period, the Defendants placed lieutenants in positions which had traditionally been occupied by captains, which they assert was done to intentionally circumvent the State's merit system requirements in order to deprive them of a promotion.  According to the Plaintiffs, the timing of the decrease in captain positions, which occurred during and

after the period when they were engaged in union organizing efforts and when they were on the eligibility list for a promotion, is sufficient to establish a causal connection between their union activities and failure to be promoted.

The Plaintiffs base their claim regarding the decrease in captain positions on testimony given by Plaintiff Hourigan. Hourigan did not explain how he computed a 32% decline, nor is there any other evidence to support his calculation. However, even assuming the 32% decline to be accurate, it is not material. As the Plaintiffs admit, in late 2006 DPS requested permission from OPM to increase the number of lieutenant positions in response to recommendations made by the New York State Police following their analysis of the DPS Professional Standards Division. This change increased the number of lieutenants assigned to the Professional Standards Division from a range of 28-31 positions to 38-41 positions. The number of captains was decreased to cover the additional costs. There is no evidence that the Defendants influenced or ordered a decrease in the number of captain positions in order to prevent the Plaintiffs from being promoted. Danaher did not even arrive at DPS until 2007, after the decision was made to add lieutenants to the Professional Standards Division and in turn decrease the number of captains. No evidence has been provided indicating that Davoren, Terenzi or Sisco was personally involved in making the decision to decrease the number of captains.

Similarly, the Plaintiffs claim that the Defendants refused to request authorization for captain promotions in order to deny the Plaintiffs a promotion. However, the evidence in the record does not support this claim. It is undisputed that, under Connecticut law, OPM must approve funding for all promotions. In

addition, DAS must review and approve an agency request to hire or promote on employee. The Division of State Police does not employ officers for a particular assignment. Instead, assignments are based upon the needs of the agency by utilizing the total allocation of positions based upon the Personnel Systems Report. Contrary to the Plaintiffs' argument, there is no evidence that the Defendants intentionally refused to request authorization for captain promotions. In fact, as Commissioner of DPS, Danaher repeatedly requested authorization to fill vacancies in the captain rank. From 2006 to 2009, DPS requested that OPM authorize the promotion of a total of eleven lieutenants to the rank of captain. However, OPM only authorized the promotion of five lieutenants to the rank of captain. Furthermore, in March 2009, two months before the 2006 list was set to expire, Danaher submitted Plaintiff Gould's request that the remaining candidates be promoted without an increase in pay to DAS. However, DAS responded that such an approach violated the state merit system, and that there were no current approved vacancies in any event. In her role as Commissioner of DAS, Sisco had no responsibility for making any actual promotion decisions; instead, her agency merely reviewed DPS captain promotions approved by OPM to ensure that State personnel statutes were followed. Davoren and Terenzi held positions within the DPS command structure. However, there is no evidence that either of them was delegated with the authority to promote the Plaintiffs but refused to do so.

The Plaintiffs further contend that retaliatory animus can be inferred because those individuals promoted to captain ahead of them were not involved in union activities. This claim is unavailing because it is undisputed that each person

promoted scored higher than the Plaintiffs on the DAS captain examination, or scored the same but had greater seniority, and therefore were ranked higher than the Plaintiffs on the promotional eligibility list.  In addition, while the Defendants admit that DPS used some lieutenants to perform certain functions that had traditionally been performed by captains, the Defendants have explained that the reason for this was that OPM only approved a limited number of promotions out of those that were requested.  There is no evidence that the Defendants had any control over OPM's decision-making process, or that they influenced OPM to withhold approval for additional captain positions.  Likewise, the Plaintiffs have produced no evidence that any of the Defendants intentionally refused to promote them to vacant captain positions that were actually approved by OPM.  While temporal proximity may create an inference of a causal connection between protected activity and a failure to promote, *see Mandell v. Suffolk County*, 316 F.3d 368, 384 (2d Cir. 2003), such an inference cannot be drawn here absent any evidence that the Defendants were personally involved in the decision to decrease the number of captain positions or withhold approval for requested promotions.

Furthermore, the Defendants have presented evidence that state budgetary limitations impacted the approval of captain promotions.  In May 2008, OPM instituted a hiring freeze because of budgetary deficits.  In June 2008, then Governor Rell proposed a five percent rescission to the 2009 DPS budget.  The Governor's rescission plan was increased in October 2008 to further reduce the DPS budget.  *Id.* In 2009, OPM announced the cancellation of vacancies due to retirements, which were not refilled.  There is no evidence that any of the Defendants were involved in

these budgetary decisions.  The Plaintiffs admit these facts, but nevertheless assert that budgetary issues had no impact on the State's failure to promote captains, and that the real reason was their presence on the captain eligibility list.  In support of this claim, the Plaintiffs rely upon a meeting they had on December 18, 2007 with Danaher, Davoren and State Police Human Resources Director Ron Savitski, who is not a defendant in this case, to discuss extending the captain eligibility list.  During this meeting, the Plaintiffs questioned Danaher, Davoren and Savitski as to why they would "kill" the captain eligibility list even though it had another year of validity.  The Plaintiffs do not indicate what response was given at that time; however, they claim that after two other lieutenants were promoted to captain in May of 2008, Terenzi informed Castagliuolo that Danaher and Davoren intended to have the captain eligibility list expire.  The Plaintiffs claim that this evidence demonstrates that the budgetary issues cited by the Defendants are pretextual because the Defendants intended to have list to expire before the State's financial difficulties began.  However, the Plaintiffs have produced no evidence that Danaher or Davoren planned to allow the list to expire for the specific reason that they did not want the Plaintiffs to be promoted.  Moreover, although he may have considered conducting a new examination, Danaher ultimately requested that DAS extend the original list, and indeed it was extended a total of four times.  The list remained active for the maximum three-year period of time that it could be active pursuant to Connecticut statute, and did not expire until May 28, 2009.  *See* Conn. Gen. Stat. § 5-217.  The Plaintiffs were on the list for this entire three-year period, and were therefore eligible for a promotion during this time.  The fact that Danaher actually ensured that the list

was extended for the maximum period possible undermines the Plaintiffs' claim that he was motivated to "kill" the list because of their union organizing activities.

### c. Defendants' Perceptions Regarding Plaintiffs' Qualifications

Finally, the Plaintiffs argue that the Defendants harbored retaliatory animus against them based upon statements made by Yelmini during her deposition that people within DPS did not believe that the remaining individuals on the captain eligibility list were qualified for the role of captain. During the relevant portion of her deposition, Yelmini was asked about an email that she wrote to Robert Genuario, the Secretary of OPS, on June 2, 2009. In that email, Yelmini recounted a conversation in which the Plaintiffs allegedly stated "just promote us and we will drop the lawsuit." Def. Rule 56(a)(1) Statement [Doc. #44-2] ¶ 27. Yelmini stated in the email "I do not believe that there was any interest in promoting at least some of these individuals on the part of DPS, but do not know for sure." *Id.* Yelmini sent a similar email to Krzys approximately one year earlier, in May 2008, during settlement negotiations between the State and the CSEA. In that email, Yelmini stated, "There were a number of people before that, who were promoted, and they believe the number that were left on the list were not people that they believed to be qualified for the captain position." Pl. 56(a)(2) Statement [Doc. #50], Part A ¶ 27. When questioned about these emails during her deposition, Yelmini explained:

> I believe it's consistent with what I said before, there were some number of people on the list, the remaining list. There were some number of people promoted at some point off that list. They got to a point where they thought the remaining individuals were not good candidates based on their qualifications for the role of captains, so they stopped. They no longer had any vacancies for captains anyway, because the governor's office would have had to have approved additional positions for

36

> captains. So they had none. And so it would have been based on that
> discussion. At some point somebody told me that.

Yelmini Tr. [Doc. # 49-17] at 38. Yelmini was unable to recall with certainty from whom she had formed the impression that the remaining individuals on the list were not qualified for a promotion, although she ultimately stated that it was "probably" based upon discussions with Danaher, Davoren or Terenzi.

The Plaintiffs claim that Yelmini's testimony evidences that the Defendants denied them a promotion due to retaliatory animus. However, even if the Defendants did not believe the Plaintiffs to be qualified, which is not clear from the testimony cited, this does not in and of itself demonstrate retaliatory animus. The Second Circuit has recognized that an employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001). There is no evidence that any of the Defendants in this case ever made any negative statements regarding the Plaintiffs' union activities. Moreover, as Yelmini explained during her testimony, there were no additional vacancies for captain positions in any event, since the Governor's office had not approved them. As discussed previously, there is no evidence that the Defendants had the unilateral authority to make captain promotions, and Danaher did in fact request authorization for additional positions while the Plaintiffs were on the eligibility list. Danaher also ensured that the expiration date of the list was extended for the maximum length of time possible and passed along Gould's request that the remaining individuals on the list be promoted to captain without an increase in pay. Therefore, there is no basis to conclude that the Defendants took adverse action

against the Plaintiffs because of their union organizing activities.

### d. Summary

In sum, the Plaintiffs have failed to submit sufficient evidence for a jury to conclude that the Defendants were personally involved in the decision not to promote them, and therefore they cannot establish causation. There is no direct evidence in this case that any of the named Defendants harbored retaliatory animus against the Plaintiffs as a result of their union organizing activities. The Court recognizes that circumstantial evidence can be used to establish the requisite retaliatory intent in a First Amendment retaliation case. *See Gronowski*, 424 F.3d at 293. However, the evidence offered by the Plaintiffs is too speculative to sustain their burden of proving that the Defendants were responsible for their failure to be promoted to captain.

Moreover, even if the Plaintiffs had produced sufficient evidence from which a causal connection could be inferred (which they have not), their claim would still fail because the Defendants have submitted ample evidence establishing that the Plaintiffs would not have been promoted regardless of their protected conduct. *See Cobb*, 363 F.3d at 102 (defendants may defeat a retaliation claim by demonstrating that they would have taken the same adverse action regardless of the protected conduct). It is undisputed that all of the individuals who were promoted ahead of the Plaintiffs scored higher on the captain examination, or scored the same but had greater seniority, and therefore were ranked higher than the Plaintiffs on the captain eligibility list. It is also undisputed that OPM, which had to approve funding for promotions, failed to provide authorization for additional captain positions even

38

though DPS requested authorization to fill additional vacancies in the captain rank while the Plaintiffs were on the eligibility list. The evidence in the record indicates that state budgetary issues in 2008 and 2009 impacted the decision to deny approval for additional captain promotions. Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' retaliation claim against them in their individual capacities.

### B. Qualified Immunity

The Defendants further assert that they are entitled to qualified immunity because their actions did not violate any clearly established constitutional right possessed by the Plaintiffs. The doctrine of qualified immunity shields government officials performing a discretionary function "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzerald*, 457 U.S. 800, 818 (1982). The Court must engage in a two-part inquiry to determine an official's entitlement to governmental immunity: whether the facts shown "make out a violation of a constitutional right," and "whether the right was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

As discussed above, the Plaintiffs have failed to present sufficient evidence to establish a retaliation claim because they cannot show that the Defendants were personally involved in denying them a promotion, and they cannot demonstrate a

causal connection between their union organizing activities and their failure to be promoted.

With regard to the qualified immunity determination, the Court finds instructive the Second Circuit's analysis in *Deters v. Lafuente*, 368 F.3d 185 (2d Cir. 2004), a case which presented circumstances similar to those of the instant matter. The plaintiffs in *Deter*s were police officers who claimed that they had been falsely arrested and subjected to departmental disciplinary charges following an incident in which a man they arrested sustained serious injuries in the course of the arrest. *Id.* at 186. Following their arrest, the plaintiffs filed a lawsuit against the City in state court alleging false arrest, malicious prosecution, and violation of their civil rights. *Id.* According to the plaintiffs, in retaliation for filing their state court lawsuit, they were subjected to a number of adverse employment actions, including not being promoted to sergeant and being subjected to continuing disciplinary proceedings even though they were known to be baseless. *Id.* at 187. They subsequently brought a Section 1983 lawsuit in federal court and asserted a First Amendment retaliation claim against the mayor and chief of police in their individual capacities. *Id* The defendants moved for summary judgment on the basis of qualified immunity, but their motion was denied by the district court. *Id.* at 188. The Second Circuit reversed on appeal, holding that the plaintiffs had failed to identify affirmative evidence showing that the defendants retaliated against them in violation of their First Amendment rights. *Id.* at 190. With respect to the plaintiffs' claim alleging unjustified continuation of the disciplinary proceedings, the Second Circuit found that there was no evidence that either defendant had the authority to determine

whether disciplinary proceedings should be dismissed or maintained, and that such authority resided instead with the City Administrator. The Second Circuit explained as follows:

> Although plaintiffs devote much of their argument to the question of retaliatory intent, intent is not an issue where, as here, defendants had no authority to act. [Defendants'] lack of authority means that they could not have retaliated against the plaintiffs in the manner complained of, and plaintiffs have pointed to no other evidence of retaliation. Thus, even if we assume all facts in plaintiffs' favor, the record is bare of evidence from which a jury could find that plaintiffs' First Amendment rights were violated by [defendants].

*Id.* at 189.

With respect to the plaintiffs' failure to promote claim against the chief of police, the Second Circuit held that the plaintiffs had not satisfied the causal connection requirement because they had failed to show that their filing of a state court action was a "substantial motivating factor" in the defendant's decision not to promote them. *Id.* at 190-91. The Second Circuit observed that, in order to meet the causal connection requirement, the plaintiffs "may not rely on conclusory assertions of retaliatory motive, but must offer instead some tangible proof to demonstrate that their version of what occurred was not imagined." *Id.* at 191 (citation omitted). The Second Circuit explained that the promotions at issue were determined by a committee of officers, and that the chief of police was not directly involved with the committee, but instead approved or disapproved the choices they made. *Id.* The Second Circuit then held that the plaintiffs could not succeed in making out a First Amendment retaliation claim because they "offered no facts supporting a retaliatory motive on the part of [the defendant]," but instead "engage in wide-ranging

speculation about what may have motivated him to act as he did with respect to plaintiffs." *Id.* Accordingly, the Second Circuit held that the defendants were entitled to qualified immunity. *Id.* at 190.

The Court finds that the reasoning of the Second Circuit in *Deters* applies here as well. There is no evidence that the Defendants had the authority to promote the Plaintiffs to captain themselves; instead, promotions had to be authorized by OPM. As Commissioner of DPS, Danaher could request approval for additional captain promotions, and indeed he did so during the time that the Plaintiffs were on the promotion eligibility list. However, the Plaintiffs were not selected for promotion when vacancies became available and OPM provided authorization for them. Instead, in accordance with the state merit system, the candidates with the highest scores on the captain examination and greatest seniority (in the event of a tie score) were selected for promotion ahead of the Plaintiffs. Given the Defendants' lack of authority to select specific individuals to be promoted, they could not have retaliated against the Plaintiffs. Like the plaintiffs in *Deter*s, the Plaintiffs cite to their failure to be promoted, and in particular the State's failure to approve a settlement that would have resulted in their promotion, and conclusorily assert that this evidences a retaliatory motive on the part of the Defendants. However, as explained by the Second Circuit in *Deter*s, such speculation cannot suffice to satisfy the causal connection requirement. The Plaintiffs have not produced any "tangible proof" to support their claim of First Amendment retaliation. *Id.* at 191. Therefore, the Defendants are entitled to qualified immunity.

### C. Official Capacity Claims

In their complaint, the Plaintiffs also assert claims against the Defendants in their official capacities. Although neither party addresses these official capacity claims in their respective briefs, the Court will nonetheless do so here in the interest of completeness.

The Eleventh Amendment generally immunizes state officials acting in their official capacities from suit under Section 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office."); *Quern v. Jordan*, 440 U.S. 332, 340-42 (1979) (holding that Section 1983 does not abrogate Eleventh Amendment immunity).

However, the Eleventh Amendment does not preclude suits against state officials acting in their official capacity that seek prospective injunctive relief. *See Ex Parte Young*, 209 U.S. 123, 155-56 (1908). Under *Ex Parte Young*, acts of state officials that violate federal constitutional rights are deemed not to be acts of the State and may be the subject of injunctive or declaratory relief in federal court. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Whether a plaintiff's claim falls within the *Ex Parte Young* exception involves a "straightforward inquiry" that asks "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

Insofar as the Plaintiffs seek a declaratory judgment that the Defendants' past

conduct violated their First Amendment associational rights, the relief sought is not prospective and is therefore unavailable. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (stating that the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past").

The Plaintiffs also seek issuance of an injunction requiring the Defendants to promote them to the position of captain.[4] "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006). As discussed above, the Plaintiffs cannot succeed on the merits of their retaliation claim because they cannot establish a causal connection between their protected activity and their failure to be promoted. Furthermore, the Plaintiffs cannot succeed on the merits for the additional reason that they have failed to adduce sufficient evidence to demonstrate an ongoing violation of federal law. All of the evidence the Plaintiffs cite in support of their retaliation claim relates to events that occurred during the period from 2006 to 2009, when they were on the captain eligibility list generated based upon the 2006 captain examination. That list expired on May 28, 2009.

---

[4] The Plaintiffs' complaint also requests that the Court enter a preliminary injunction barring the promotion eligibility list for the position of captain from expiring on May 28, 2009 until further order of the Court. In conjunction with filing the complaint, the Plaintiffs moved for a preliminary injunction seeking the same relief. On April 28, 2009, the Court denied the motion on the basis that the facts alleged do not establish irreparable injury. [Doc. # 22]. The Plaintiffs thereafter filed a second motion for preliminary injunction [Doc. #25], which was denied by the Court on May 20, 2009, again on the basis that the Plaintiffs had failed to demonstrate irreparable injury. [Doc. #28]. The captain eligibility list then expired on May 28, 2009. Therefore, this particular request is moot.

Thereafter, a new examination was conducted and DAS promulgated a new captain eligibility list based upon the examination results. Plaintiffs Castagliuolo, Wack, Hourigan and Daly passed the examination and are on the current eligibility list. No evidence has been presented regarding where they rank on the list. Plaintiffs Gould, Salzano and Whitaker either did not take or did not pass the examination and are not on the list. The Plaintiffs do not allege any retaliatory actions having been taken against them since the new list was promulgated in 2009. Therefore, there is no ongoing violation of federal law. Summary judgment is granted for the Defendants on the Plaintiffs' official capacity claims.

### IV. CONCLUSION

Based upon the above reasoning, the Defendants' motion for summary judgment is GRANTED. The Clerk is directed to enter judgment for the Defendants, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 29, 2011.